**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

MARIAELENA KELLY CUNHA,

       Plaintiff,

v.                                          CV 12-1115 WPL

CAROLYN W. COLVIN, *Acting Commissioner*
*of the Social Security Administration*,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

Mariaelena Kelly Cunha filed applications for Disability Insurance Benefits and Supplemental Security Income on November 17, 2008. (Administrative Record ("AR") 13.) She alleges disability beginning on January 1, 2008, due to Bipolar Disorder and post-traumatic stress disorder ("PTSD"). (AR 164.) Administrative Law Judge ("ALJ") Ben Willner held a disability hearing on April 6, 2011. (AR 27-65.) On July 29, 2011, he determined that Cunha was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 13-21.) Cunha filed an appeal with the Appeals Council, but the Council declined her request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-3.)

Cunha sought review of the SSA's decision (Doc. 1) and filed an opposed Motion For Reversal And Remand for Rehearing (Doc. 21). Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the parties consented to have me serve as the presiding judge and enter a final judgment. Having carefully considered the pleadings, facts, and relevant law, I grant Cunha's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). A "decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* (quotation omitted). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the ALJ. *See id.* The ALJ's "failure to apply the correct legal standards, or to show us that she has done so, [is] also grounds for reversal." *Winfry v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996) (citing *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to the those in the Listing of Impairments, then, before reaching step four, the ALJ determines the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ compares the claimant's RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from

performing his past work, then he is not disabled. *Id.* If the claimant cannot return to his past work, then the Commissioner must show at the fifth step that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

## FACTUAL BACKGROUND

Cunha is a forty-one year old woman with a GED. (AR 32, 36.) She has worked as a cashier and a waitress and was last employed at Walmart, but she left her job at Walmart in 2008 due to psychological problems.[1] (AR 36, 38, 164, 165.) Shortly after leaving her job, on September 3, 2008, Cunha voluntarily went to the emergency room of Kaseman Presbyterian Hospital for depression and suicidal ideation. (AR 265, 270.) She was admitted to the hospital, where Robert Kellogg, M.D., ultimately diagnosed Cunha with severe mixed Bipolar Disorder, polysubstance dependence in remission, and a Global Assessment of Functioning ("GAF") score[2] of thirty-eight[3] on intake and forty-five to fifty[4] on discharge. (AR at 253.) He noted that

---

[1] The AR contains alternative explanations as to whether Cunha quit her job or was fired. Cunha reported to her healthcare provider on September 9, 2008, that changes in the organization and routine in the halfway house where she was staying led to her psychiatric episode and hospitalization. (AR 330.) She stated that because she did not call Walmart during her episode, she was fired. (*Id.*) She told a different healthcare provider that same day that her psychiatric episode was the result of depression over not being with her nineteen year-old son and that she did not like herself. (AR 327.) During the hearing, Cunha told the ALJ she had received a warning from her supervisors at Walmart regarding her attendance because she had missed nineteen days of work in eight months, and the warning caused her to have a panic attack so she had to quit. (AR 36.)

[2] A GAF score is a rating that reflects the individual's overall level psychological, social and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000) (hereafter "DSM-IV").

she showed "substantial progress" during her six-day hospitalization and that her "major issue" was that she needed to "decrease her mood swings." (*Id.*)

The day after her release, Cunha was seen by Amara Heising, LMFT, LADAC,[5] at Albuquerque Health Care for the Homeless ("HCH"). (AR 329-31.) Heising referred Cunha to therapeutic housing and support groups. (AR 330.) Cunha also saw Fauzia Malik,[6] who changed her psychiatric medications. (AR 326.)

Shortly after her release from Kaseman, on October 15, 2008, Cunha went to the University of New Mexico Psychiatric Center after stating that she wanted to drink herself to death. (AR 312.) Elizabeth Weil, M.D., assessed her GAF at thirty-nine but found that she did not have any suicidal ideation. (*Id.*) Dr. Weil chose not to admit Cunha into the hospital and discharged her after modifying her medications and referring her for further treatment at HCH. (AR 304-07, 312-13.)

The next day, Cunha returned to HCH for psychiatric treatment where she saw Heidi Rogers, FNP-C. (AR 324.) She was prescribed Geodon, fluoxetine, and trazodone. (AR 325.) On October 24, 2008, Cunha returned to HCH where she was referred to an initial psychiatric evaluation. (AR 320-23.)

Cunha regularly received treatment from HCH until 2011. During that time, HCH providers worked with Cunha to identify the most effective medications for her disorder and adjust the dosages. On January 6, 2009, Cunha reported that she had started taking Geodon once

---

[3] A GAF score of thirty-one to forty indicates major impairments in several areas such as work or school, family relations, judgment, thinking or mood. DSM-IV at 34.

[4] A GAF score of forty-one to fifty indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV at 34.

[5] Licensed Marriage and Family Therapist and Licensed Alcohol and Drug Abuse Counselor.

[6] The treatment notes do not indicate Malik's title. (AR 326-27.)

4

a day but wanted to take it twice a day. (AR 375.) At the appointment, she stated that other than her depression, her psychological issues were "well controlled." (*Id*.) In February 2009, Cunha requested that her dosage of Geodon be reduced, so the provider changed her prescriptions. (AR 537.) In April, Cunha reported not feeling well and experiencing mood swings, so she asked for her Geodon and Lexapro to be increased. (AR 533.) Five days later, she reported that she was "feeling better" and more stable on the new prescribed combination of Geodon and Lexapro. (AR 532.)

In May 2009, Cunha returned to HCH, this time stating she was a "wreck" and asking to be put on Topamax. (AR 528.) Tina Carlson, APRN, BC,[7] noted that Cunha had tangential, rambling thoughts and seemed unstable, moody, and very crisis oriented. (*Id*.) Nurse Carlson prescribed Cunha Topamax in addition to the Geodon. (*Id*.) When Cunha returned to see Nurse Carlson in July 2009, she reported that the Topamax was helping and that she felt like she had more control. (AR 524.)

On October 8, 2009, William Zolin, M.D., treated Cunha for worsening depression. (AR 513.) Cunha stopped taking her Geodon in mid-September and wished to discontinue the Lexapro. Dr. Zolin prescribed her Paxil and put her back on the Geodon. (AR 514.)

Nurse Carlson saw Cunha again on November 12, 2009. (AR 506-08.) Nurse Carlson reported that Cunha had gotten herself into trouble when she went off her Geodon in September and that she had "multiple excuses for why she never comes to appointments." (AR 507.) During the appointment, Cunha agreed to meet with Nurse Carlson monthly. (*Id*.)

Between December 2009 and March 2010, Cunha was incarcerated for seventy-two days for "verbally assaulting someone." (AR 625 (quoting Cunha).) On March 19, 2010, she went to an appointment at HCH, where she reported that her increase in Geodon was working well. (*Id*.)

---

[7] Advanced Practice Registered Nurse, Board Certified.

On June 27, 2010, Cunha was sent to the New Mexico Behavioral Health Institute in Las Vegas, New Mexico, for a thirty-day court commitment due to depression and suicidal ideation (AR 595), and she was admitted for a seven-day hold (AR 609). Her GAF score at the time of intake was thirty,[8] and she had normal behavior and thought content, organized thought process, fair insight, poor judgment and was oriented in all four spheres. (AR 608-09.) By the time Cunha was released on July 7, 2010, she had a GAF score of forty-five, and her mental status examination was mostly normal. (AR 597-99.)

After her discharge, Cunha again returned to see Nurse Carlson at HCH, and Nurse Carlson noted she was "somewhat dramatic in her presentation" but that her thoughts were linear, logical, and well-organized. (AR 627.) Cunha missed her appointment scheduled for September 14, 2010 (AR 633), but attended an appointment on October 1, 2010, in order to request a medication change. (AR 632.) She was taken off of Topamax and prescribed lithium.

Cunha missed her November 2010 appointment with Nurse Carlson and attended appointments in February 2011 and June 2011 for changes to her medications. (AR 635-36, 642-44.)

In 2009 and 2010, the SSA sent Cunha for consultative examinations. On February 25, 2009, Cunha saw James Harrington, Ph.D. (AR 435-40.) He reviewed her records from HCH and Kaseman Presbyterian and interviewed her. (AR 435.) Cunha informed Dr. Harrington that she was applying for benefits because she was unable to hold a job due to her unstable moods. (*Id.*) Dr. Harrington observed that she was pleasant and cooperative, with coherent and tangential thoughts. (AR 438.) She did not show signs of mania such as rapid or pressured speech, flight of ideas, or grandiose thinking, and she did not demonstrate signs of anger or unstable mood during

---

[8] A GAF score of twenty-one to thirty indicates serious impairments in communication or judgment or an inability to function in almost all areas, such as by staying in bed all day or having no job, home, or friends. DSM-IV at 34.

the interview. (*Id.*) He noted that Cunha was able to function in her present, highly structured setting, where her medications were monitored and controlled. (AR 440.) He believed her GAF score to be at fifty, and he did not offer an opinion about her ability to work. (*Id.*)

On April 30, 2009, Scott Walker, M.D., performed a mental RFC assessment (AR 442-44) and a psychiatric review technique (AR 446-58). His final mental RFC assessment was that Cunha's "abilities are highly dependent on continued sobriety/abstinence and on her duties being well defined/specific with regular supportive supervision." (AR 444.) He also opined that Cunha could understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers, and respond appropriately to changes in a routine work setting. (*Id.*) In his psychiatric review technique, Dr. Walker found that she had Bipolar Disorder (AR 449), chronic PTSD (AR 451), and cocaine and alcohol abuse, in remission (AR 454). He concluded that she is doing "pretty well" in a highly structured environment. (AR 458.)

A year later, on May 17, 2010, Cunha was evaluated by Anne Ortiz, Ph.D. (AR 572-75.) Cunha told Dr. Ortiz that since she had started on Geodon a year before, it had "done wonders for [her]" and that she was "not as freaked out about things as [she] used to be." (AR 572.) Cunha was cooperative during the mental status examination; received a thirty out of thirty on the Folstein Mental Status Exam; was oriented to all four spheres; had a good short-term, long-term, and recent memory; had good attention; and had an average IQ. (AR 574.) Dr. Ortiz believed Cunha's perception, insight, and judgment to be fair. (*Id.*) Dr. Ortiz assessed Cunha's GAF score to be sixty-five,[9] and she noted that Cunha's prognosis was good. (AR 575.) She did not believe that Cunha had any limitations with respect to her ability to understand and

---

[9] A GAF score of sixty-one to seventy indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and has some meaningful interpersonal relationships. *See* DSM-IV at 34.

remember, concentrate or persist at tasks, interact with supervisors, co-workers, or the public, or adapt. (AR 575.)

Following Dr. Ortiz's evaluation, Paul Cherry, Ph.D., performed a second mental RFC assessment and psychiatric review technique. (AR 577-89.) He noted that Cunha had been in a transitional living facility for the last year and that she reported doing well on Geodon. (AR 589.) He believed that the results from Dr. Ortiz's exam supported this assessment. After considering Cunha's history, though, he opined that she only retains the ability to perform simple tasks on a sustained basis. (*Id.*)

### HEARING TESTIMONY

The ALJ held a hearing on August 6, 2011, at which Cunha, social worker Daryl Lino, and Vocational Expert ("VE") Diane Webber testified. (AR 28.) At the hearing, Cunha was assisted by Micki Kindley, a non-attorney representative. (AR 29.) The ALJ began the hearing by admitting additional records and then proceeded to question Cunha about her weight. (AR 30-34.) Cunha testified she had put on seventy pounds while on medication, but when the ALJ asked if she had tried to lose weight, she replied "Not really . . . [b]ecause I'm lazy." (AR 34.) She then asked about her prior work experience, and Cunha explained that her last job was with Walmart, but she left after she had a panic attack. (AR 36.)

Next, the ALJ asked about her living situation. Cunha told the ALJ she lives in an apartment by herself and that her rent is paid by Shelter Plus Care. (AR 37.) General Assistance from the State of New Mexico covers her other costs, and she receives food stamps. (AR 38.) The ALJ then asked her if she still had trouble getting out of bed, and Cunha said that she has problems getting out of bed about one day a week due to depression. (*Id.*) She stated that usually she will get up and go to her friend's house, and they play cards, watch TV, or play with her

8

friend's grandchildren. (AR 39-40.) In addition to going to her friend's home, she will see her social worker, Daryl Lino, and her therapist once a week, but she admitted to missing several appointments with her therapist. (AR 42.) She will occasionally go to the movies, and she also likes to read. (AR 42-43.) She stated that her goal is to get out of the house every day for five hours and she has been successfully doing that, which is a "big improvement compared to what [she] used to do." (AR 43.) When asked if she had a hard time being around a lot of people, she stated that she did not feel comfortable in such situations because she hates all the noise. (AR 43-44.)

Next the ALJ inquired about her addictions. She testified that she no longer went to Alcoholics Anonymous and she didn't have a sponsor. (AR 44.) Cunha hadn't had alcohol in almost a year and was not doing street drugs. (*Id*.) With respect to her prescribed medications, she stated that she takes those every day.

When the ALJ finished questioning Cunha, her representative cross-examined her. (AR 45.) Cunha stated that she had a problem with violence and that she used to get extremely violent but that Geodon had "really helped with that" and that "it took away [her] violent thinking." (*Id*.) She stated that men triggered her violence but that she was able to work with her male boss at Walmart. (AR 45-46.) When asked if she thought she could work now, she responded, "I wish I could, but I don't think I would make it every day. I know I wouldn't . . . I'm unreliable and I can't be trusted to make it. I can't even make it to my therapist meetings and I need that lady." (AR 46.)

The ALJ asked Cunha to describe the problems that hold her back. (AR 40.) In addition to depression, Cunha stated that she gets panic attacks and her PTSD is triggered by being around babies since one of her daughters died in infancy. (AR 40-41.)

9

The ALJ the proceeded to examine Lino. Lino had been Cunha's case manager for about fifteen months at the time of the hearing, and he stated that he tries to meet with her once a week, but because she misses appointments, he sees her about twice a month. (AR 48.) He explained that he helps Cunha obtain community services like food boxes, inspects her apartment, and helps her "manage her life." (*Id*.) The ALJ asked how Cunha was doing, and Lino testified that "[s]he's doing fine with support," but he did not believe that she would be able to function well without it. (AR 48-49.)

The ALJ asked Lino to describe Cunha's functioning. Lino stated that it was erratic and that she had a hard time prioritizing. (*Id.*) According to Lino, Cunha does not treat certain responsibilities, such as checking in with her probation officer, as important. (AR 49-50.) Lino has discussed the matter of prioritizing with Cunha, but she "didn't want to address it. It was . . . like beating a dead horse." (AR 51.) As for activities of daily living, Lino stated she was meeting the goal of leaving the house every day. (AR 52.) He also believed she was capable of cooking and cleaning but that she had some problems due to "lack of motivation which may or may not be the depression." (*Id*.) Lino stated that Cunha has a lot of behavioral issues, and they have tried to address these issues with therapy, but she had not been attending the sessions. (AR 53.) When asked if he believed Cunha could sustain work, Lino said no. (AR 54.)

The VE testified at the conclusion of the hearing. The ALJ asked the VE to assume a person of the same age, education, and work history as Cunha who was limited to work that involved only simple tasks with simple instructions, working primarily with things rather than people, and who could only maintain concentration, pace, and persistence at such tasks for two hours at a time. (AR 57.) The ALJ then asked if the hypothetical person could perform jobs available in the regional or national economy. (AR 58.) The VE testified that the individual

could perform the following jobs: garment folder, which has 433,370 jobs available in the national economy and 1,650 in New Mexico; a shipping and receiving weigher, which has 69,890 jobs in the national economy and 340 in New Mexico; or a mail clerk or mail sorter, which has 131,750 jobs in the national economy and 420 in New Mexico. (AR 58-62.) The VE testified that all three jobs had a skill level of two and were considered unskilled. (*Id.*)

**THE ALJ DECISION**

The ALJ reviewed Cunha's applications for benefits according to the sequential evaluation process. At the first step, the ALJ found that Cunha had not engaged in substantial gainful activity since her alleged onset date of January 1, 2008. (AR 15.) Then, at the second step, the ALJ concluded that she suffers from the severe impairments of an affective mood disorder, major depression, and obesity. (*Id.*) At step three, the ALJ found that Cunha's combination of severe impairments did not equal one of the listed impairments. (AR 16-17.) The ALJ then reviewed the medical evidence and determined that Cunha had the RFC to perform a full range of work at all exertional levels but that due to her mental impairments she was limited to simple tasks with simple instructions and working with things rather than people and that she can only maintain concentration, pace, and persistence for two hours at a time. (AR 17.)

At step four, the ALJ concluded that Cunha could not perform her past relevant work. (AR 20.) He considered Cunha's age, education, work experience, and RFC and concluded that, based on the testimony of the VE, Cunha could perform the work of a garment folder, shipping and receiving weigher, or mail sorter. (AR 20-21.) Accordingly, the ALJ concluded that Cunha was not eligible for benefits. (AR 21.)

## DISCUSSION

Cunha argues that the ALJ's decision contains three errors. First, she challenges the ALJ's mental RFC determination, arguing that the ALJ improperly interpreted and applied Dr. Walker's assessment and failed to address her limitations in her ability to attend and concentrate. (Doc. 21 at 13.) Second, Cunha asserts that the VE's testimony was inconsistent with the Dictionary of Occupational Titles, and the ALJ's failure to investigate that inconsistency renders his reliance on the VE's testimony erroneous. (*Id.* at 17.) Third, she claims that the ALJ did not consider whether there were a sufficient number of job available in the local economy with respect to one of the VE's proffered occupations. (*Id.* at 18.) Because I find Cunha's first argument meritorious, I will not consider the remaining two.

In formulating a claimant's RFC, the ALJ must consider and evaluate every medical opinion in the record, including the medical opinions of state agency examiners. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ is not bound by the opinions of state examiners, but he or she "may not ignore these opinions and must explain the weight given to the opinions in their decisions." SSR 96-6p, *2, 1996 WL 374180 (1996). Although an ALJ is the ultimate arbiter of a claimant's RFC, if the record contains an RFC assessment from a state agency medical or psychological consultant, then the ALJ must consider that evaluation using the rubric for the consideration of opinion evidence from non-examining sources. *Id.* at * 4. The rubric directs ALJs to assess the supportability of the opinion by objective medical findings, consistency with the record as a whole, the specialization of the examiner, and other factors. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e).

The requirement that the ALJ must not "ignore" state agency evaluations is far from a rigid requirement requiring a detailed analysis of every finding contained in each state agency

opinion. In *Norris v. Barnhard*, the claimant challenged the validity of the RFC assessment on the ground that the ALJ did not state what weight, if any, he assigned to the opinion of a state agency examiner concerning back pain. *See* 197 F. App'x 771, 773 (10th Cir. 2006) (unpublished). While the ALJ did not expressly discuss the examiner's opinion with respect to certain RFC limitations, the court held that he hadn't "ignored" the opinion because it was "apparent that [the ALJ] relied on it because he reviewed it as part of the medical evidence that supported the RFC determination." *Id*. In *Norris*, all of the evidence in the record was consistent, so the court did not believe that the ALJ needed to make specific findings regarding the weight given to each opinion. *Id*. a 774. Rather, the general discussion of the evidence was sufficient.

While *Norris* is not controlling, it is a persuasive example of how best to apply SSR 96-6p. The SSR is not an inflexible mandate that the ALJ march through each component of every evaluation. Conversely, the ALJ must, at some point during his or her analysis of the record, address the findings of these evaluations.

With these legal principles in mind, I turn to Cunha's first objection. She argues that the ALJ gave significant weight Dr. Walker's assessment but failed to mention Dr. Walker's finding that Cunha's capabilities are dependent on continued sobriety and abstinence and that she needed well defined and specific duties with regular supportive supervision. (Doc. 21 at 13.) According to Cunha, the ALJ should have considered whether Dr. Walker was suggesting that Cunha required special conditions, which would show an inability to engage in substantial gainful activity. (*Id*. at 14.)

At first blush, this does not seem like a reversible issue; however, in raising Dr. Walker's assessment and SSR 96-6p, Cunha stumbles across a far more serious error that she failed to raise in her brief or in her reply. The ALJ never specifically mentions Dr. Walker's evaluation.

13

Instead, he refers to the opinion of "the [s]tate [a]gency medical consultant who completed a Mental Residual Functional Capacity Assessment," and then cites to Dr. Walker's evaluation. (AR 19.) The problem is that there are two state agency medical consultants and two mental RFC assessments: one from Dr. Walker, dated April 30, 2009, and one from Dr. Cherry, dated May 27, 2010. (AR 442-45, 446-59, 577-93.) Dr. Cherry, like Dr. Walker, completed a mental RFC assessment and a psychiatric review technique, but the ALJ did not make any reference to Dr. Cherry's evaluations or his findings.

While the ALJ is not required to discuss each detail of each consultative evaluation, nor must he specifically state the weight he is assigning when the record appears consistent, *see Norris*, 197 F. App'x at 774, the ALJ must acknowledge the presence of the opinion in some manner, *see* SSR 96-6p. The fact that there is no reference in the entire opinion to Dr. Cherry's mental RFC or his psychiatric review technique amounts to a procedural error.

The failure to discuss Dr. Cherry's evaluation is not harmless. First, Dr. Cherry's mental RFC assessment and psychiatric review technique are the most recent evaluations in the record, so they had the benefit of being based on a larger body of medical information, including the psychological evaluation of Dr. Ortiz. Dr. Ortiz is the only examiner in the record to find that Cunha has no mental limitations, and it post-dates Dr. Walker's RFC and psychiatric review technique. (AR 575.) I express no opinion as to the validity of Dr. Ortiz's evaluation; nonetheless, I note that her opinion differs a great deal from that of the other evaluators. (*Compare* AR 575 (Dr. Ortiz's evaluation) *with* AR 435-40 (Dr. Harrington), *and* AR 255-58 (Dr. Kellogg's Psychiatric Diagnostic Examination).) Despite the differences between Dr. Ortiz's findings and the other evaluations in the record, the ALJ relied heavily on Dr. Ortiz's evaluation and concluded that Cunha did well when on medications and that her symptoms

would likely be better controlled if she was more compliant with her treatment. (AR 18-19.) Given the difference between Dr. Ortiz's evaluation and the other evaluations on the record, and given the fact that the ALJ relied on Dr. Ortiz's findings in making his determination, it seems all the more important that the ALJ consider Dr. Cherry's evaluations since he was the only evaluator to review Dr. Ortiz's findings in conjunction with Cunha's entire medical history. (AR 589.) Furthermore, despite Dr. Ortiz's evaluation that Cunha was improving, Dr. Cherry did not opine that Cunha had resolved all of her mental limitations; in fact, based on her history, Dr. Cherry felt that she still had limitations and should perform only simple tasks.[10] (AR 589, 593.)

Dr. Cherry's opinion is also inconsistent with the ALJ's interpretation of some of the evidence insofar as it reflects Cunha's consistency. The record contains numerous statements and observations that indicate that Cunha is unreliable and has great difficulty regularly arriving at scheduled appointments. (*See, e.g.,* AR 46 (Cunha's testimony that she did not think she could make it to work every day); AR 49-52 (Lino's testimony that Cunha's functioning is erratic and she does not attend appointment); AR 507, 633 (HCH treatment records indicating that she missed psychiatric appointments).) It is logical to conclude that her inability to attend appointments regularly would translate into potential absenteeism in a work setting. In fact, according to Cunha's hearing testimony, she had difficulty regularly attending work at Walmart, and she was reprimanded for that behavior. (AR 36.) In adjudicating this case, it is paramount to consider whether Cunha's unreliability is a psychological symptom of one of her mental impairments and is, therefore, out of her control, or if it is simply an unfortunate character trait that she could remedy if she so desired.

---

[10] Admittedly, the ALJ came to a similar conclusion with respect to Cunha's ability to do simple tasks, but, as will be discussed further, he did not consider some of the other limitations discussed in Dr. Cherry's evaluation. (*See* AR 17.)

The ALJ did not phrase this issue in such stark terms, but he did address Cunha's unreliability in his opinion. He stated that "she refuses to attend even one [therapy] session," that "she seeks treatment only when in crisis," and that she does not "follow through with her treatment recommendations." (AR 19.) The ALJ's linguistic choices indicate that the he found Cunha's unreliability is a choice, not the uncontrollable product of serious psychological disorders.

While there is surely substantial evidence in the record to support the ALJ's conclusion, the evidence in the record is not uniform by any means. Specifically, Dr. Cherry's mental RFC assessment found that she has moderate limitations in the ability to complete a normal workday or workweek without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods because of "psychologically based symptoms." (AR 592.) While this finding does not explicitly speak to Cunha's reliability, the reference to completing a normal workweek and performing at a consistent pace implicates a continual, sustained effort to be present and focused day after day. Dr. Cherry believed that Cunha would have limitations in this area as a result of her psychological symptoms.

This is a distinction that is not insignificant. In fact, Cunha's case in many ways turns on how the ALJ interprets her medical history. If the ALJ sees the missed appointments and poor management of her medication regimens as a choice or somehow attributable to Cunha's lack of desire to stabilize her mental health, then it is easy to conclude Cunha is not entitled to benefits. After all, under this scenario, her symptoms are of her making, and she could choose to take better care of herself and commit to a schedule and, thus, sustain gainful employment. However, if the ALJ concludes that these actions are out of her control, that Cunha's psychological disorders are so severe that she cannot avoid excessive absenteeism, then she would likely be

entitled to benefits. This is a crucial interpretation, so it is not acceptable for the ALJ to overlook Dr. Cherry's evaluation. Even should the ALJ ultimately afford Dr. Cherry little weight and agree with Dr. Walker, who notably found no limitation with respect to Cunha's ability to complete a normal workday or workweek (AR 443), and Dr. Ortiz, who believed Cunha was improving (AR 575) , the ALJ must have a discussion of this evidence on the record. The failure to include one in this case is a valid basis for remand.

### Conclusion

Procedurally, the ALJ erred by ignoring Dr. Cherry's opinion. Had Dr. Cherry's evaluations merely echoed the evidence already in the record, I might overlook it as harmless, but this is not the case. It crucial that the ALJ discuss Dr. Cherry's evaluations because he was the only evaluator to perform a mental RFC assessment based on the entire medical record, including Dr. Ortiz's evaluation, and his opinion subtly contradicts the ALJ's assessment. Although Cunha did not directly raise the failure of the ALJ to mention Dr. Cherry's opinion as a basis for remand, it is impossible to ignore this error. I grant the motion to remand with the express instruction that the ALJ consider the evidence and explain the weight he will give to Dr. Cherry's findings.

IT IS SO ORDERED.

_William P. Lynch_
William P. Lynch
United States Magistrate Judge